UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

TERRY L. DANIELS,               :
                                :
            Plaintiff           :     No. 4:08-CV-1676
                                :
      vs.                       :     (Complaint Filed 9/10/08)
                                :
MICHAEL J. ASTRUE,              :
COMMISSIONER OF SOCIAL          :     (Judge Muir)
SECURITY,                       :
                                :
            Defendant           :

**ORDER**
April 15, 2009

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Terry L. Daniels's application for social security disability insurance benefits.  Because of legal and factual errors committed by the administrative law judge which we will discuss below, this case will be remanded to the Commissioner for further proceedings.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Daniels meets the insured status requirements of the Social Security Act through December 31, 2010.  Tr. 17 and

50.[1]  In order to establish entitlement to disability insurance benefits Daniels must establish that she suffered from a disability on or before that date.  42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

Daniels, who was born on September 30, 1962, claims that she became disabled on January 15, 2005, because of neck, mid-back, and low back pain, migraine headaches, a left ankle and right elbow injury, and fibromyalgia.  In August of 2005 Daniels suffered multiple fractures to her pelvis and in September of 2005 blood clots in the lower extremities which she claims added to her inability to work. Tr. 15, 33, 64-65 and 101-102, 371-438.  At the time of the onset of her alleged disability, Daniels was employed by Sanofi Pasteur, Inc.,[2] Swiftwater, Pennsylvania,  as a pharmacovigilance[3] scientist. Tr. 47 and 73.  She also had been employed as a registered nurse and cardiology technician for Lehigh Valley Hospital. Allentown, Pennsylvania.  Tr. 45-46, 52 and 73.

---

1.  References to "Tr.___" are to pages of the administrative record filed by the Defendant as part of his Answer on November 17, 2008.

2.  Sanofi Pasteur, a subsidiary of the French pharmaceutical company Sanofi Aventis, makes vaccines for several illnesses, including influenza, polio and meningitis.

3.  Pharmacovigilance is the monitoring of adverse effects of drugs as they are used in the population.

On November 1, 2005, Daniels protectively[4] filed an application for disability insurance benefits. Tr. 15.[5] Daniels's claim was initially denied by the Social Security Administration on January 10, 2006. Tr. 31–37.  On March 20, 2006, Daniels requested a hearing before an administrative law judge. Tr. 38.  After a delay of over a year, a hearing was held before an administrative law judge on May 9, 2007. Tr. 461–493.  On July 5, 2007, the administrative law judge issued a decision denying Daniels's application for benefits. Tr. 15–23.  On August 17, 2007, Daniels filed an appeal of the administrative law judge's decision to the Appeals Council of the Social Security Administration.  Tr. 11.  On April 11, 2008, the Appeals Council concluded that there was no basis upon which to grant Daniels's request for review.  Tr. 5–7.  Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

On September 10, 2008, Daniels filed a complaint in this court requesting that we reverse the decision of the Commissioner

---

4.  Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

5.  We scoured the administrative record consisting of 493 pages and were unable to locate a copy of Daniels's application for social security disability benefits.  The administrative law judge in her decision stated that Daniels protectively filed her application on November 1, 2005.  Tr. 15.  However, a document entitled "Disability Report – Field Office – Form SSA-3367" states that the protective filing date is October 6, 2005. Tr. 61.

denying her disability benefits.[6]  On the same day the Clerk of Court assigned responsibility for this case to the undersigned for disposition.

The Commissioner filed an answer to the complaint and a copy of the administrative record on November 17, 2008.  After being granted an extension of time, Daniels filed her brief on February 19, 2009, and the Commissioner filed his brief on March 24, 2009.  The appeal[7] became ripe for disposition on April 3, 2009, when Daniels filed a reply brief.

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is

---

6.  Generally an individual denied disability benefits has 60 days from the final decision of the Commissioner to file a civil action in the district court.  In the present case, however, on August 8, 2008, the Social Security Administration issued a letter granting Daniels an extension of time to file such an action within 30 days of receiving the letter.  Tr. 9-10. The letter of August 8, 2008, further indicated as follows: "We assume that you received this letter 5 days after the date on it unless you show us that you did not receive it within the 5-day period." Tr. 9.

7.  Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight

5

of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

Another critical requirement is that the Commissioner adequately develop the record. Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000)("The ALJ has an obligation to develop the record in light of the non-adversarial nature of benefits proceedings, regardless of whether the claimant is represented by counsel."); Rutherford v. Barnhart, 399 F.3d 546, 557 (3d Cir. 2005); Fraction v. Bowen, 787 F.2d 451, 454 (8th Cir. 1986); Reed v. Massanari,

270 F.3d 838, 841 (9th Cir. 2001); <u>Smith v. Apfel</u>, 231 F.3d 433.

437 (7th Cir. 2000);  <u>see also</u> <u>Sims v. Apfel</u>, 530 U.S. 103, 120

S.Ct. 2080, 2085 (2000)("It is the ALJ's duty to investigate the

facts and develop the arguments both for and against granting

benefits[.]").  If the record is not adequately developed, remand

for further proceedings is appropriate.  <u>Id.</u>

To receive disability benefits, the plaintiff must

demonstrate an "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for
> work.  For purposes of the preceding sentence (with
> respect to any individual), "work which exists in the
> national economy" means work which exists in significant
> numbers either in the region where such individual
> lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in

evaluating disability insurance claims.  <u>See</u> 20 C.F.R. §404.1520;

<u>Poulos</u>, 474 F.3d at 91-92.  This process requires the Commissioner

to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[8] (2) has an impairment that is severe or a combination of impairments that is severe,[9] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[10] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[11]

---

8.  If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.

9.  The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limit the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. §§ 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process.  20 C.F.R. §§ 404. 1523 and 404.1545(a)(2).

10.  If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled.  If not, the sequential evaluation process proceeds to the next step.

11.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  <u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  The residual functional capacity assessment must include a discussion of the individual's abilities.  <u>Id</u>; 20 C.F.R. § 404.1545; <u>Hartranft</u>, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

In this case the administrative law judge at step one found that Daniels had not engaged in any substantial gainful activity since January 15, 2005, the alleged onset date of Daniels's disability. Tr. 17.

At step two, the administrative law judge found that Daniels suffers from the following severe combination of impairments: chronic back, hip and pelvis pain syndrome, fibromyalgia and a history of migraine headaches.  Tr. 18.  None of these impairments individually were found severe by the administrative law judge.

At step three the administrative law judge found that Daniels's impairments did not individually or in combination meet or equal a listed impairment.  Tr. 18.

At the hearing before the administrative law judge the vocational expert testified that Daniels's past relevant work was semiskilled to skilled in nature and ranged from sedentary to

heavy exertional work activity.  Tr. 488-489.  In addressing step
four of the sequential evaluation process, the administrative law
judge found that Daniels could not perform any of her past
relevant work.  However, the administrative law judge's residual
functional capacity determination is vague and inconsistent.  At
one point the administrative law judge states that Daniels "has
the residual functional capacity to perform a **wide range** of light
work." (Emphasis added.)  Tr. 18.  At another point the
administrative law judge states

> the claimant has the residual functional capacity to
> perform light work, as defined and described in the
> Social Security Rules and Regulations, which would
> allow for lifting and carrying **10 pounds occasionally**,
> **5 pounds frequently**, standing/walking or sitting
> each for six hours during the course of a regular
> eight-hour workday with occasional climbing, handling
> with the non-dominant arm in work that would allow
> the worker to avoid concentrated exposure to extremely
> hot or cold temperatures, excess humidity, pollutants,
> irritants and would not require working around hazardous
> machinery, unprotected heights, ropes, ladders,
> scaffolds or on vibrating surfaces and would not expose
> the claimant to flashing lights.

Tr. 21 (emphasis added).  At another point the administrative law
judge states that Daniels "is limited to performing a **reduced**
**range of light work** with the limitations described above, and
therefore, cannot perform any past relevant work.  The claimant's
past relevant light-duty work did not allow for the either the
sit-stand option or the exertional limitations set forth above."
Tr. 21 (emphasis added).  Again at another point the
administrative law judge states that Daniels "can perform a **wide**

10

**range of light work** which exists in significant numbers in the regional economy, and in greater numbers in the state and national economies, which the claimant can perform consistent with all limitations." Tr. 22.

Sedentary and light work are described at 20 C.F.R. § 404.1567 as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work*.  Light work involves **lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds**.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  **To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.** If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

(Emphasis added.)

By limiting Daniels to lifting and carry 10 pounds occasionally and 5 pounds frequently the administrative law judge set Daniels's exertional limitations at something less than light work.  In fact the residual functional capacity set by the administrative law judge in her decision is more in accord with the definition of sedentary work.

Also during the hearing on May 9, 2007, the administrative law judge took testimony from a vocational expert to determine whether or not jobs exist in the national economy for an individual of Daniels's age, education, work experience and residual functional capacity.  The vocational expert concluded that Daniels could not perform her past work, but could perform the unskilled, light work of order clerk, assembler, and inspector and there were significant numbers of such jobs in the national and local economies. Tr. 640.  At step five, the administrative law judge concluded that Daniels was not disabled because she could perform the jobs identified by the vocational expert and that such jobs exist in significant numbers in the national and local economies.  Tr. 22.  However, the testimony of the vocational expert was based on the correct exertional limitations for light work – 20 pounds occasionally, ten pounds frequently. At the hearing, the administrative law judge asked the vocational expert to assume that Daniels could "lift[] and carry[] 20 pounds occasionally, ten pounds frequently."  Tr. 490.  Daniels's exertional limitations set by the administrative law judge in her decision were 10 pounds occasionally, 5 pounds frequently.  There is no testimony in the record from the vocational expert that Daniels could perform the jobs of order clerk, assembler and inspector with the exertional limitations set by the administrative law judge in her decision.  Consequently, the decision of the administrative law judge as step five of the

sequential evaluation process is defective.  However, this is not the only defect in the decision of the administrative law judge.

We will review the evidence, including evidence relating to Daniels's education, employment and medical history, and then specify the additional errors committed by the administrative law judge in evaluating the evidence.

The administrative record reveals that Daniels was forty-four years of age at the time of the hearing before the administrative law judge and was considered a "younger individual" under the Social Security regulations.[12]  Daniels has a high school education and two years of college. Tr. 71.  Daniels commenced working as a cardiology technician for Lehigh Valley Hospital in 1992.  Tr. 45 and 75.  She worked as a cardiology technician part-time until January, 1993, and then worked full-time as a registered nurse for Lehigh Valley Hospital until May of 1999.  Tr. 46, 73 and 80. In March of 1999, she suffered a trauma to her head when a tanning bed lid fell on her. Tr. 105.  As a result of the injury to her head, Daniels left the nursing field. Tr. 80.  In May of 1999, Daniels obtained a position as a self-employed consultant auditor for a pharmaceutical company. Tr. 46-47 and 73.  Her self-employment earnings in 1999 were $33,319.00. Tr. 47.  In February of 2000 she commenced employment as a clinical research associate for Sanofi Pasteur, Inc.  Tr. 47 and

---

12.  The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

73.  In July of 2001 she became a pharmacovigilance associate at
Sanofi Pasteur, Inc., and in September of 2002 a pharmacovigilance
scientist.  Tr. 73.  Her employment with Sanofi Pasteur, Inc.,
ceased when she fell and sustained an injury to her ankle in early
2005.  Tr. 80.

     At this point we will review some of the records of
medical treatment which Daniels received prior to sustaining the
injury to her ankle and elbow in early 2005.  As noted Daniels
suffered a head trauma in 1999 which resulted in her changing
jobs.  In 2000 and 2001 Daniels was employed by Sanofi Pasteur,
Inc., and her earnings during those years were $37,662.17 and
$49,547.88, respectively.  Tr. 47.

     In chronological order the first medical record
contained within the administrative record is from 2001.  On March
19, 2001, Daniels had an appointment with James J. Kerrigan, M.D.,
Neurology Associates of Monroe County, P.C., East Stroudsburg,
Pennsylvania.  Tr. 155-157.  Dr. Kerrigan sent a letter to
Daniels's family physician after that appointment which states in
pertinent part as follows:

> The patient . . . presents with symptoms of back pain
> and headaches.  She states her symptoms began after an
> injury at a tanning salon.  She states that she pushed
> the button to have the lid drop down on her on 3/9/99
> and the mechanism broke and the lid came down on her
> head.  She states that since that time she has had
> symptoms of headache and neck pain radiating to the
> left arm.  She states she was initially seen for
> headaches by a neurologist in the Allentown area
> after she was having headaches almost daily. She
> states that Depakote helped to reduce the frequency
> of the headaches and she was able to subsequently get

14

off the head medication. She states she continues to have migraine headaches about 1-3 x a week.  She states that she typically gets a visual disturbance before the headache. . . .  The headache usually lateralizes to the left side.  Over the left eye she has a stabbing pounding pain associated with photophobia, sonophobia and nausea.  She typically takes a nonsteroidal medication Fiorinal with codeine to help with the headache.

In addition, she notes pain on the left side of her neck associated with spasm.  The pain will occasionally travel over the left arm associated with numbness and pain at the medial 3 fingers of the left hand . . . Apparently she is on physical therapy and doing yoga with light massage and finds that these do help.

  *      *      *      *      *      *      *      *      *      *      *

PHYSICAL EXAMINATION: . . .

. . . . . Head is atraumatic and normocephalic.  Neck is supple with mild restriction mobility and lateral rotation left side.  There is tenderness along the lateral cervical region, supraclavicular and infraclavical fossa regions currently as well as along the medial scapular border region. There is some tenderness to the left neurovascular bundle region. There is a positive Tinel's[13] in the decubital[14] tunnel region bilaterally, negative at the wrists over the median and ulnar nerve. . . . .

Sensory examination reveals decreased sharp dull sensation along the medial 3 fingers of the left hand to the palm area . . . .

MRI of the cervical spine was reviewed.  This demonstrates a small central C5-6 of the left

---

13.  The Tinel's sign is "an indication of irritability of a nerve; a distal tingling sensation on percussion of a damaged nerve.  The sign is often present in carpal tunnel syndrome and is produced by tapping over the medial nerve on the volar aspect of the wrist."  Mosby's Medical Dictionary,___(8th Ed. 2009).

14.  The cubital tunnel is a channel which allows the ulnar nerve ("funny bone") to travel over the elbow. See The Merck Manuals Online Medical Library, http://www.merck.com/mmpe/sec04/ ch042/ch042f.html (visited April 14, 2009).

lateralized disk herniation without any neuroforaminal or canal impingement. EMG[15] study demonstrated chronic denervation changes consistent with C8/T1 chronic radiculopathy[16] vs medial cord plexopathy.

CLINICAL IMPRESSION:
1.   Left brachial plexopathy[17] secondary to head trauma with head rotated to the right side.  I have recommended continuing with therapy under your care.
2.   Posttraumatic headache syndrome with strong vascular features.  I have recommended a trial of Imitrex, the nasal spray or pills and avoid any use of Fiorinal with codeine.  If her headache frequency persists, would consider another course of a prophylactic treatment.

Tr. 156–157.  During the remainder of 2001 Daniels had several

appointments with Dr. Kerrigan and James B. Kim, D.O., of Dr.

Kim's Rehabilitation Office, LLC, Wind Gap, Pennsylvania.  Tr.

123, 124, 152,  153, and 154.  During these appointments, Daniels

complained, inter alia, of migraine headaches, cervical pain,

---

15.  "EMG" is an abbreviation for electromyography which "is a test that assesses the health of the muscles and nerves controlling the muscles." http://www.nlm.nih.gov/medlineplus /ency/article/003929.htm (visited April 14, 2009).

16.  Radiculopathy refers to any disease affecting the spinal nerve roots.  A herniated disc is one cause of radiculopathy. See Dorland's Illustrated Medical Dictionary, 1405 (27th Ed. 1988).

17.  According to National Institute of Health's online medical library "[b]rachial plexopathy is decreased movement or sensation in the arm and shoulder due to a nerve problem."  It is also noted that it "is a form of peripheral neuropathy" and "occurs when there is damage to the brachial plexus, an area where a nerve bundle from the spinal cord splits into the individual arm nerves."  http://www.nlm.nih.gov/medlineplus/ency/article/ 001418.htm (visited April 14, 2009).  The brachial plexus is described as "a group of spinal nerves that run from the lower neck through the upper shoulder area" and "allow the arm, forearm, and hand to move and feel things."  http://www.nlm.nih. gov/medlineplus /ency/ article/002239.htm (visited April 14, 2009).

paresthesias[18] of the medial aspect of the left hand, numbness in left arm, low back pain radiating down the right lower extremity, and medication side effects.  The doctors' physical examination findings included tenderness and spasm in the cervical and trapezius regions particularly on the left and medial scapular region on the left, Erb's point[19] tenderness on the left and limitation of lateral flexion and rotation of the cervical spine. Tr. 123, 124, 152,  153, and 154.  The assessments of both doctors in 2001 included left brachial plexopathy and posttraumatic vascular headaches.  Dr. Kim in 2001 also assessed Daniels with cervical myofascial pain.[20]  Tr. 124.

In 2002 Daniels was employed by Sanofi Pasteur, Inc., and earned $62,568.04.  Tr. 47.  The administrative record reveals that in 2002, Daniels had two medical appointments with Dr. Kerrigan.  The first appointment occurred on April 3. 2002. Tr.

_____

18.  "Paresthesias" is defined as tingling, numbness or loss of sensation. http://www.nlm.nih.gov/medlineplus/ency/article /003206.htm (visited April 14, 2009).

19.  The Erb's point (punctum nervosum) is a site at the lateral root of the brachial plexus 2-3 centimeters above the clavicle at about the level of the sixth cervical vertebra where six types of nerves meet. See Mosby's Medical Dictionary,___(8th Ed. 2009)

20.  Myofascial pain "is a chronic form of muscle pain" and "centers around sensitive points in your muscles called trigger points."  http://www.mayoclinic.com/health/myofascial-pain-syndrome/ds01042 (visited April 14, 2009). Although "[n]early everyone experiences muscle pain . . . that resolves in a few days" those "with myofascial pain syndrome have muscle pain that persists or worsens." Id.  This type of pain "has been linked to many types of pain, including headaches, jaw pain, neck pain, low back pain, pelvic pain and arm and leg pain."  Id.

150-151.   During that appointment Daniels had "an **uncontrolled** migraine" headache.  Tr. 150 (emphasis in original).  Daniels told Dr. Kerrigan that "she gets the headaches four times a month, which is significant decrease from the daily headaches she experienced several years ago after her accident."  Tr. 150.  Dr. Kerrigan's physical examination revealed "no cervical tenderness or spasm . . . bilaterally" but that Daniels's "lateral rotation of the head did elicit numbness and tingling in the left arm."  Tr. 150.  Dr. Kerrigan did not notice any "decrease in strength in the upper extremities bilaterally."  Tr. 150.  Dr. Kerrigan's diagnostic impression or assessment was that Daniels suffered from "left brachial plexopathy, stable at this time" and "posttraumatic vascular headaches."  Tr. 150.

The second appointment with Dr. Kerrigan in 2002 was on October 28, 2002.  Tr. 149.  At that appointment Daniels stated that she was "doing fairly well."  Tr. 149.  She did tell Dr. Kerrigan that in September she had a "headache for about two weeks straight, at times quite severe." Tr. 149.  Dr. Kerrigan's physical examination of Daniels revealed "some tenderness along the posterior cervical region on the left side just above the trapezius area" and that Daniels's "[r]ange of motion [was] mildly restricted to rotation to the left side."  Tr. 149.  Dr. Kerrigan's assessment was that Daniels suffered from posttraumatic vascular headaches and cervical myofascial pain with brachial plexopathy.  Tr. 149.

18

In 2003 Daniels was employed by Sanofi Pasteur, Inc., and earned $81,745.62.  Tr. 47.  The administrative record reveals two appointments with Dr. Kerrigan in 2003: February 7th and September 8th.  At the appointment on February 7, 2003, Daniels stated that "overall she has been doing much better" and that "she has been having about 2 headaches a month."  Tr. 148.  However, she also told Dr. Kerrigan "that she had a slip and fall on the ice the other day and since that time she has been having more frequent headaches."  Tr. 148.  Dr. Kerrigan's physical examination of Daniels revealed "decreased range of motion of the neck to the left side which is unchanged" and his diagnosis was "[p]osttraumatic vascular headaches under reasonably good control with current management" and "cervical myofascial pain."  Tr. 148. Dr. Kerrigan directed that she continue her massage therapy.  Tr. 148.

At the appointment on September 8, 2003, Daniels stated she "was having increased headaches."  Tr. 146. She also complained of bilateral neck pain associated with decreased mobility in the neck.  Tr. 146.  Dr. Kerrigan's physical examination of the neck revealed "mild restricted mobility with range of motion to the left side."  He also noted "tenderness along the left medial scapular border region as well as the posterior cervical paraspinal musculature bilaterally predominantly in at the intracranial cervical junction region, right greater than left."  Tr. 146.  There was "no weakness noted

in the upper extremities." Tr, 146.  Dr. Kerrigan's diagnosis was posttraumatic vascular headaches and cervical myofascial pain with brachial plexopathy.  Tr. 146-147.

In 2004 Daniels was employed by Sanofi Pasteur, Inc., and earned $85,080.14.  Tr. 47.  The administrative record reveals that Daniels had numerous medical appointments during the year 2004, including appointments with Dr. Kim and Dr. Kerrigan.  Tr. 113-121 and 143-145.  Daniels continued to complain of headaches and neck, shoulder, upper back and low back pain.  She also complained about difficulty sleeping and fatigue.  Physical examinations by Dr. Kim routinely revealed tenderness and spasms over the back and limitation of lateral flexion and rotation of the cervical spine.  Dr. Kim's assessment was that Daniels suffered from posttraumatic vascular headaches, cervical myofascial pain with brachial plexopathy, daytime fatigue, thoracolumbar and sacroiliitis pain and myofascial pains.  Tr. 113-121.

On November 12, 2004, Daniels had an appointment with Charles L. Ludivico, M.D., of East Penn Rheumatology Associates, P.C., East Stroudsburg, Pennsylvania.  Tr. 105-106.  Dr. Ludivico found that Daniels was "tender 18 out of 18 triggerpoints per [American College of Rheumatology] criteria for fibromyalgia." Tr. 106.[21]  Dr. Ludivico's assessment was that Daniels suffered from

---

21.  The Mayo Clinic website describes tender or trigger points as follows:

(continued...)

posttraumatic fibromyalgia.[22]

———————————————

21.   (...continued)
      Tests and diagnosis

      The American College of Rheumatology has established
      two criteria for the diagnosis of fibromyalgia:

      ■ Widespread pain lasting at least 3 months

      ■ At least 11 positive tender points-out of a total
        possible of 18

      Tender Points

      During your physical exam, your doctor may check
      specific places on your body for tenderness.  The
      amount of pressure used during this exam is usually
      just enough to whiten the doctor's fingernail bed.
      These 18 tender points are a hallmark for fibromyalgia.

http://www.mayoclinic.com/health/ fibromyalgia/DS00079/
DSECTION=tests%2Dand%2Ddiagnosis (visited April 10, 2009).


22.  Fibromyalgia is described by the American College of
Rheumatology in pertinent part as follows:

      Fibromyalgia is an often misunderstood, even
      unrecognized disorder, that causes widespread muscle
      pain and tenderness which tends to come and go, and
      move about the body.  This common and chronic condition
      also can be associated with fatigue, sleep disturbances
      and memory problems.

      Fast facts

        ● Fibromyalgia affects 2 to 4 percent of the
        population, predominantly women.

        ● There is no laboratory or other diagnostic test
        for fibromyalgia so it must be diagnosed on
        patient symptoms and physical examination.

      *    *    *    *    *    *    *    *    *    *    *

      What is fibromyalgia?

                                          (continued...)

_____

22.   (...continued)
Fibromyalgia is a clinical syndrome defined by chronic widespread muscular pain, fatigue and tenderness.  Many people with fibromyalgia also experience additional symptoms such as fatigue, headaches, irritable bowel syndrome, irritable bladder, cognitive and memory problems (often called "fibro fog"), temporomandibular joint disorder, pelvic pain, restless leg syndrome, sensitivity to noise and temperature, and anxiety and depression.  These symptoms can vary in intensity and, like the pain of fibromyalgia, wax and wane over time.

*     *     *     *     *     *     *     *     *     *     *

How is fibromyalgia diagnosed?

Unfortunately, there are no what are called "objective markers"–evidence on X-rays, blood tests or muscle biopsies–for this condition, so patients have to be diagnosed based on the symptoms they are experiencing.

Because pain and tenderness are the defining characteristics of fibromyalgia, medical care providers focus on the features of the pain to distinguish it from other rheumatic disorders.  For instance, hypothyroidism and polymyalgia rheumatica often mimic fibromyalgia.  However, blood tests for TSH (thyroid stimulating hormone) and ESR (erythrocyte sedimentation rate) values can differentiate these diagnoses from fibromyalgia.

*     *     *     *     *     *     *     *     *     *     *

The role of the rheumatologist

Fibromyalgia is not a form of arthritis (joint disease) and does not cause inflammation or damage to joints, muscles or other tissues.  However, because fibromyalgia can cause chronic pain and fatigue similar to arthritis, it may be thought of as a rheumatic condition.  As a result, it is often the rheumatologist who makes the diagnosis (and rules out other rheumatic diseases), but your primary care physician can provide care and treatment for fibromyalgia. . . .

http://www.rheumatology.org/public/factsheets/diseases_
and_conditions/ fibromyalgia.asp?aud=pat (visited April 10,
                                        (continued...)

On December 20, 2004, Daniels had an appointment with
Dr. Kerrigan.  Tr. 143.  Dr. Kerrigan's report of that appointment
states in pertinent part as follows:

> Terry returns in follow-up today.  She is a 43-year-
> old woman who has been seen in the past for her
> headaches related to head trauma.  She called today
> telling me that she had another head injury over the
> weekend and needed to be seen.
>
> She states that on Saturday afternoon she and her
> fiancé were working on the go-cart that they had
> gotten her son and states they were having difficulty
> starting it, she moved in close to see what they were
> doing at which point her fiancé pulled the starter
> cord and [she was] hit in the forehead with his elbow.
> She states with impact she fell back landing on her
> back, she denied any loss of consciousness, but was
> dazed.  She states that since that time she has had
> a frontal headache associated with neck pain, dizziness,
> nausea, concentration difficulties and irritability . .
> . .

Tr. 143.  Dr. Kerrigan's physical examination of Daniels revealed
some tenderness in the frontal area and decreased range of motion
of the neck in both extension and lateral rotation.  Tr. 144.
Dr. Kerrigan suspected that Daniels suffered a "concussion with
post concussion syndrome and he recommended that Daniels undergo
"an MRI of the head to rule out any structural abnormalities such
as a contusion as well as an EEG[23] given her atypical spells to

_____

22.  (...continued)
2009).

23.  "EEG" is an abbreviation for electroencephalography which
"is a test to detect problems in the electrical activity of the
brain." http://www.nlm.nih.gov/medlineplus/ency/article/
003931.htm (visited April 14, 2009).

rule out seizure given her travel plans." Tr. 145.  Daniels had planned to take a trip to the Caribbean region and anticipated scuba diving. Tr. 144.  Dr. Kerrigan "recommended that she not plan to do much in the way of scuba diving unless her symptoms improve dramatically in the interim . . ."  Tr. 145.

Sometime in early January, 2005, Daniels suffered a fall down a flight of steps and injured her left ankle and right elbow. Tr. 140-142.  As noted earlier in this order Daniels worked for Sanifo Pasteur, Inc., through 2004 and up until January 15, 2005, the alleged onset of her disability.  Social Security records indicate that Daniels earned $52,754.01 from Sanofi Pasteur, Inc., in 2005.  Tr. 47.  The administrative law judge in her decision found that Daniels did not engage in any substantial gainful activity after January 15, 2005, so we have to assume that the majority of the 2005 earnings were from accrued sick leave or disability benefits from her employer.

On February 18, 2005, Daniels had an appointment with Dr. Kim.  Tr. 110.  Dr. Kim's physical examination of Daniels revealed "tenderness and spasms in the cervical, trapezius and lumbar paraspinal musculatures" and "tenderness in the anterolateral aspect of the left ankle."  Dr. Kim noted that Daniels had 5/5 or normal muscle strength in both upper and lower extremities.  Dr. Kim's assessment was that Daniels was suffering from cervical myofascial pains with brachial plexopathy, posttraumatic vascular headaches, daytime fatigue, thoracolumbar

24

myofascial pains and sacroiliac pain, a history of migraine headaches and status post recent left ankle sprain.  Tr. 110.[24] He adjusted her medications and recommended that she continue with physical therapy.

On March 1, 2005, Daniels telephoned Dr. Kim's office "upset because she stated that she was seen by her foot doctor and was diagnosed with osteo and chondritis (sic)[25] of the ankle and she is supposed to be nonweight bearing and she is in a wheelchair. She states that she was told there might be permanent damage and she wanted to know if she could get a second opinion." Tr. 109 Dr. Kim referred her to Mountain Valley Orthopedics for an opinion.  Tr. 109.[26]

On April 15, 2005, Daniels had an appointment with Dr. Kim.  Tr. 111-112.  Dr. Kim's report of that appointment states in pertinent part as follows:

> Ms. Daniels comes to me for an office visit.  Since the last time she has seen me she has been complaining of increased right hip pain.  This has been since she has required using crutches and nonweight bearing in the left lower extremity.  She is nonweight bearing on the

---

24.  We scoured the administrative record and were unable to locate any medical records from the physician who initially treated Daniels's ankle and elbow injury.

25.  We believe this should be osteochondritis which is a painful condition where the cartilage and bone in a joint is inflamed.

26.  Our review of the medical records contained within the administrative record reveals that there are many gaps.  It appears that records of some medical appointments after the alleged disability onset date are missing from the administrative record, e.g., there are no medical records from Mountain Valley Orthopedics.

left lower extremity because of her left ankle injury
which still has not completely healed.  The last time
I saw her she had been treated by Coordinated Health
Systems however she wanted a second opinion and she
was seen by Dr. Cibischino.[27]  Her MRI apparently showed
a bone bruising and Dr. Cibischino kept her nonweight
bearing in the left lower extremity.  She has still not
been able to bear weight on the left lower extremity.
The swelling has improved but she still gets pain.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Physical examination: She has tenderness and spasms
in the cervical and trapezius regions bilaterally as
well as the medial scapular region.  She has tenderness
over the lateral epipicondylar region particularly on
the right.[28] . . . She has tenderness in the mid to
lower lumbar regions as well as the right trochanteric
bursa region.[29] . . . The left lower extremity is in a
CAM walker.[30]

Gait analysis: She is ambulating using bilateral
axillary crutches nonweight bearing on the left.[31]

Tr.  111.  Dr. Kim's assessment of Daniels on April 15th was that

she was suffering from cervical myofascial pains and brachial

plexopathy, thoracolumbar myofascial pains and sacroiliac pain,

---

27.  The administrative record does not contain the Coordinated
Health System records or the records of Dr. Cibischino's
treatment of Daniels.

28.  This is a reference to the right elbow.

29.  This is a reference to the upper femur and hip region.

30.  A CAM walker also known as a CAM walker orthosis is a type
of ankle brace which is generally worn after an injury such as a
fracture or after surgery to the ankle or foot.  It acts like a
plaster cast to provide stability to the leg and ankle.

31.  One troubling aspect of the administrative law judge's
decision, inter alia, is that the administrative law judge gives
no indication as to how long Daniels was ambulating with an
assistive device, such as crutches or a wheelchair.

and right trochanteric bursitis "which all have been exacerbated
due to her nonweight bearing status of the left lower extremity
due to her ankle pain and injury with required use of upper
extremity assistive device." Tr. 111. Dr. Kim further found that
she suffered from right lateral epicondylitis, posttraumatic
vascular headaches, daytime fatigue, history of migraine headaches
and status post ankle sprain and bone bruising. Tr. 111. Dr.
Kim adjusted Daniels's medication and recommended that she
continue with physical therapy. Tr. 112.

On April 26, 2005, Daniels had an appointment with Dr.
Kerrigan. Tr. 140-142. Dr. Kerrigan in his report of the
appointment references the head injury that Daniels suffered in
December of 2004 by stating as follows:

> Terry returns in follow up today with a new problem.
> With respect to her old problem, she states that her
> post concussion symptoms quickly left her. She no
> longer has the dizziness or other unusual symptoms that
> she was experiencing in late December. She states,
> however, on January 8th, during the difficulties of the
> ice storm she was carrying a heater down some steps, she
> miss stepped and dislocated her left ankle. She states
> she was having unusual pain symptoms and is here to see
> me in this regard. She was initially treated at
> Coordinated Health seeing a podiatrist. She states
> that she was given an air splint and crutches, after a
> while she was told to just walk on it. She noted the
> pain increased associated with increased swelling and
> became very red and hot. An MRI performed on February
> 22nd demonstrated changes consistent with bone bruise
> and edema as well as an area of osteochondritis
> (a copy of the report is in her chart).[32] She states
> that at that point she was instructed to stay off of
> it. She decided to get a second opinion working with

_____

32. We were unable to locate that report in the administrative
record.

Dr. Cibischino.  She was placed in a brace and has
been using crutches.  More recently she has been told
to try using the foot more and has been given some range
of motion exercises. She states from the onset she
started noticing the swelling in the leg, she also notes
the left leg is cooler than the right leg and has been
changing colors.  It is typically quite dusky and blue
when she wakes up in the morning and at other times is
red or pale.  She has also been noting a burning type
pain symptom predominantly on either side of the
ankle associated with some tingling in the toes . . .
She has been noting these symptoms for the past couple
months. . . .

Tr. 140.  Dr. Kerrigan's physical examination revealed tenderness

at the left Erb's point area with tenderness and spasm along the

left medial scapular border region over the rhomboid area[33] and

the trapezius area. He also noted a positive Tinel's over the

neurovascular bundle region of the left arm.  In the lower

extremities, he noted "a slight duskiness to the left leg relative

to the right."  Tr. 141.  He observed a "[m]inimal temperature

difference . . . in the lower extremities with the left side being

slightly cooler than the right" and "[m]ild hyperpathia[34] . . .

with light touch."  Tr. 141. He noted allodynia[35] with light touch

---

33.   The rhomboid muscle is a muscle on the back which connects
the scapula with the vertebrae of the spinal column. See http://
www.med.unmich.edu/1libr/sma/sma_rhomboid_sma.htm (visited April
14, 2009).

34.   Hyperpathia is an exaggerated reaction to things that
normally cause pain with the feeling of pain continuing after the
stimulus that causes pain has been removed. See Dorland's
Illustrated Medical Dictionary, 796 (27th Ed. 1988).

35.   Allodynia is pain resulting from a usually non-painful
stimulus to normal skin. See Dorland's Illustrated Medical
Dictionary, 50 (27th Ed. 1988).

in the left foot distally below the ankle and a positive Tinel's over the tibial nerve and the sural nerve.   Dr. Kerrigan's assessment was that Daniels was suffering from an injury to the left ankle with some findings suggestive of complex regional pain syndrome or RSD, left brachial plexopathy exacerbated by use of her crutches, and stable posttraumatic vascular headaches. Tr. 141-142.

On May 24, 2005, Daniels had a consultation regarding her chronic pain with Yasub N. Khan, M.D., of Comprehensive Pain Center, Allentown, Pennsylvania.   Tr. 301-304.   Dr. Khan's physical examination of Daniels revealed that "[r]ange of motion was decreased at the cervical spine in all planes secondary to increase in pain with reproducible facet joint tenderness noted C3 through C6 bilaterally as well as trapezius muscle spasm and multiple myofascial trigger points noted at the paraspinal cervical muscles."   Dr. Khan also observed bilateral occipital nerve tenderness, chest and thoracic spine diffuse myofascial trigger points, tenderness in the area of the brachial plexus bilaterally and increased pain with motion of the ankle.   Tr. 302-303.   Dr. Khan recommended cervical and lumbar facet injections. Tr. 304.

Daniels underwent a series of facet joint injections on June 7 and 16 and July 5, 2005, with only temporary relief. Tr. 295, 297 and 300.   The administrative record also reveals that

Daniels had many sessions of physical therapy in 2004 and 2005. Tr. 252–283.

On June 16, 2005, Daniels had an appointment with Dr. Kim. Tr. 108.  During that appointment Daniels complained of neck and low back pain.  Dr. Kim's physical examination revealed tenderness and spasms in the trapezius, cervical, and lumbar regions.  He also noted tenderness over the right elbow region and that she was "full weight bearing."  Tr. 108. Dr. Kim's assessment was that Daniels was suffering from cervical myofascial pains with brachial plexopathy, thoracolumbar myofascial pains, right trochanteric bursitis, right lateral epicondylitis and history of posttraumatic vascular headaches, status post ankle sprain and bone bruising, migraine headaches and daytime fatigue.  Tr. 108.

On July 27, 2005, Daniels had an appointment with Dr. Kerrigan.  Tr. 138.  Dr. Kerrigan's physical examination of Daniels revealed tenderness with spasm in the right greater than the left trapezius muscle.  Dr. Kerrigan's assessment was that Daniels suffered from posttraumatic headaches with vascular features and cervical spasm with a history of brachial plexopathy. Tr. 138–139,

On August 13, 2005, Daniels suffered a severe traumatic injury when she was thrown from a horse while riding in the Wind River area of Wyoming.[36]  At the administrative hearing, Daniels

---

36.  Wind River area is located in Fremont County, Wyoming, in the northwest section of the state and is home to the Wind River
(continued...)

explained why she was in Wyoming and why she was on horseback

several months after her disability onset.   She stated:

> . . . in that time my father passed away and we were
> taking his . . . he wanted his ashes scattered, so I
> was unable to walk to take his ashes and neither was
> my step-mother, so she hired an outfitter to take
> his ashes to his final resting place.   So we were
> going to take horses up to his final resting place.
> We had his ashes packed.   And my horse, this is when
> the back injury happened to me, my horse reared up
> and over and crushed me.[37]

Tr. 485.   Daniels was thrown from the horse she was riding and the

horse rolled over on her causing a severe traumatic injury to her

pelvis.   Tr. 179.   She was air transported to the Eastern Idaho

Medical Center. Idaho Falls, Idaho.   Tr. 179.   A CT scan of

Daniels abdomen at that facility revealed the following:

> [T]here is a fracture through the right L5 transverse

---

36.   (...continued)
Indian Reservation, the seventh largest in the country, which is
home to the Eastern Shoshone and Northern Arapaho.

37.   It is important to note that although Daniels alleged a
disability onset date of January 15, 2005, she did not file an
application for disability insurance benefits until November 1,
2005, well after she sustained the injury while riding a horse in
Wyoming.

process[38] as well as a fracture extending down through the  right side of the sacrum involving the right sacral foramina.[39]   There is also a comminuted fracture[40] through the medial aspect of the right iliac bone[41] extending into the right sacroiliac joint as well as widening of the right sacroiliac joint.[42]  In addition there is a fracture involving the left superior pubic ramos which also extends into the anterior aspect of the left acetabulum to the articular surface of the left hip joint.  There is some soft tissue swelling around the region of the fractures of the left superior pubic ramos and anterior acetabulum on the left.  The left inferior pubic ramos was not included within the region of the scan, probably because the patient was positioned slightly asymmetrically in the scanner.

There does appear to be some hemorrhage within the left side of the pelvis.

IMPRESSION:

---

38.  A vertebra consists of several elements, including  the vertebral body (which is the anterior portion of the vertebra), pedicles, laminae and the transverse processes.  The vertebral body is the largest part of the vertebra and is somewhat oval shaped. The pedicles are two short processes made of bone that protrude from the back of the vertebral body.  The laminae are two broad plates extending dorsally and medially from the pedicles and fusing to complete the vertebral arch (which is the posterior portion of the vertebra) and encloses the spinal cord. On an axial view of the vertebra, the transverse processes are two somewhat wing-like structures that extend on both sides of the vertebral body from the point where the laminae join the pedicles. The transverse processes serve for the attachment of ligaments and muscles.

39.  The sacral foramina are openings for nerves and blood vessels.

40.  A comminuted fracture is a fracture in which the bone is broken, splintered or crushed into a number of pieces.

41.  The ilium (also called the iliac bone) is the uppermost and widest of the bones constituting the lateral halves of the pelvis.

42.  The sacroiliac (SI) joint is the joint between the sacrum and the ilium of the pelvis.

> 1.   MULTIPLE PELVIC FRACTURES AS DESCRIBED ABOVE
>       INVOLVING THE RIGHT SIDE OF THE SACRUM, THE
>       RIGHT ILIAC BONE, THE LEFT SUPERIOR PUBIC RAMUS
>       AND THE LEFT ACETABULUM AS WELL AS WIDENING OF THE
>       RIGHT SACROILIAC JOINT AND ALSO A FRACTURE OF THE
>       RIGHT L5 TRANSVERSE PROCESS.  THERE IS SOME
>       SURROUNDING SOFT TISSUE AROUND THE FRACTURES AS
>       WELL AS SOME HEMORRHAGE IN THE LEFT SIDE OF THE
>       PELVIS. . . .

Tr. 181.  Daniels spent 12 days in the hospital and during that time had two operations.  Tr. 158-159 and 172-176.  An initial closed reduction surgery was performed on August 13, 2005, involving the placement of various hardware, including pins and screws.  That surgery had to be revised on August 20, 2005. Tr. 159 and 172.  The discharge report explains this second surgery as follows:

> Postoperatively, as we tried to mobilize the patient, she had some persisting left sided pain along the anterior ring and she was returned to the Operating Room for fixation of the anterior ring.  At this procedure, the SI screw was removed.  Significant efforts to unlock this posterior displaced sacral fragment were made, however, this still left about 8 mm posteriorly displaced.  The anterior ring was fixed with a plate and then a screw was placed along the pubic ramus and into the pelvis behind the quadrilateral surface.

Tr. 158-159.  Daniels was discharged from the hospital on August 24, 2005.  Tr. 158.

After her discharge from the hospital in Idaho she returned to Pennsylvania and continued to complain of pain in her pelvis and back.  Tr. 211-213.  On September 13, 2005, Daniels had an appointment with Patrick J. Brogle, M.D., Orthopaedic Surgical Group, Bethlehem, Pennsylvania.  Tr. 212-213. During that

33

appointment, Daniels complained of "pain about the pelvis and
paresthesias and excruciating burning type pain over the dorsum of
her left foot." Tr. 212. After examining Daniels, Dr. Brogle
stated in a letter to Robert Katz, M.D., Daniels's family
physician,[43] that "Terry understands that she has a pelvic mal
reduction. However, I have no access to her previous films.
Despite a mal reduction, her ring appears intact and she should be
capable of full function when she heals." Tr. 213.

From September 29, 2005, to October 2, 2005, Daniels was
hospitalized at St. Luke's Hospital, Bethlehem, Pennsylvania. Tr.
196-197, 200-201, 204, 207, 218, 219 and 371-438. Daniels was
diagnosed with deep venous thromboses (DVTs) of the lower
extremities based on an venous duplex ultrasound performed at
Pocono Medical Center Imaging Services. Tr. 219. A second
ultrasound performed on October 1, 2005, revealed that the DVTs
had resolved. Tr. 207 and 218.

On October 18, 2005, Daniels again had an appointment
with Dr. Brogle. Tr. 211. In a letter to Dr. Katz regarding that
appointment Dr. Brogle states in part as follows:

> Terry Daniels presents 8 weeks following initiation of
> treatment for an unstable pelvic fracture. . . .
> I explained to Terry she has an imperfectly reduced
> pelvis, however, she appears to be progressing towards
> radiographic union. At this point in time she can
> perform progressive weightbearing on the right lower
> extremity. She will require an additional 2 weeks of
> at home therapy followed by four weeks of outpatient

---

43. We did not locate any medical records from Dr. Katz in the
administrative record.

physical therapy.

Tr. 211.   At an appointment with Dr. Brogle on November 15, 2005,

Daniels reported "some posterior pelvic pain on the right side

more pronounced than the left."   Tr. 209.   In a letter to Dr.

Katz regarding the appointment Dr. Brogle stated as follows:

> X-rays, two views about the pelvis demonstrate the
> presence of a plate and screws securing the symphysis.[44]
> There is a superior ramus screw on the left side. There
> is a single cannulated screw securing the posterior
> aspect of the pelvis.  On the right side there appears
> to be some radiographic consolidation.
> I explained to Terry I see no interval changes in her
> x-rays.  Therefore, I think she is considered a
> candidate for weightbearing to tolerance on both
> lower extremities.  She requires more therapy for
> strengthening and conditioning both lower extremities. .
> . .

Tr. 209.   In a letter issued the same day to obtain additional

physical therapy coverage for Daniels, Dr. Brogle stated as

follows:

> Terry Daniels is a patient of mine.  She is 12 weeks
> following initiation of surgical care for an unstable
> pelvic fracture.  She has been told that her physical
> therapy benefits have been exhausted.  As she has
> recovered from a significant injury about the pelvis,
> an injury that requires not only surgical care but a
> period of progressive rehabilitation involving partial
> weightbearing and slowly advance to tolerance, she
> does require the services of a qualified physical
> therapist.  This is in order to optimize her recover[y]
> of function following a catastrophic injury.  This
> injury classically requires at least 4 to 6 months of
> post operative recovery.  Therefore, at 3 months I
> am unable to say how much longer she will require the

---

44.  The pubic symphysis is a the slightly movable interpubic
joint of the pelvis, consisting of two pubic bones separated by a
disk of fibrocartilage and connected by two ligaments. Mosby's
Medical Dictionary,__(8th Ed. 2009).

> services of physical therapy. However, I think it
> fair to say she will need it for an additional 2 to
> 3 months.

Tr. 210.

On December 12, 2005, Daniels had an appointment with

Dr. Kerrigan at which time she was still ambulating with crutches.

Tr. 310-311.  Dr. Kerrigan's assessment of Daniels was that she

suffered from posttraumatic headaches with some exacerbation

secondary to her brachial plexopathy.  He further noted that her

brachial plexopathy was exacerbated because she was using

crutches. Tr. 310.

On December 13, 2005, Daniels had an appointment with

Dr. Brogle.  Tr. 448.  A letter issued by Dr. Brogle to Dr. Katz

regarding that appointment states that Daniels

> is here reporting some soft tissue irritability about
> the anterior aspect of both of her hips, worse with her
> hip in a flexed position.  She also does report
> occasional ankle instability as well.  She reports no
> low back pain.  She asked about when she will be able to
> return to activities that she likes to do such as cross
> country skiing.
>
> On exam her lumbar spine is non-tender along the
> mid-line.  There is no paraspinal spasm.  Her pelvis
> is stable to manual stress.  There is no limb length
> discrepancy about both lower extremities.  She
> demonstrates a good arc of hip motion bilaterally.
> Figure 4 maneuvers fail to elicit pain.  At the
> posterior pelvis it does cause anterior hip
> irritability.
>
> X-rays, AP pelvis demonstrate the presence of pelvic
> asymmetry.  There appears to be healed superior and
> inferior ramus fractures on the left side.  The
> anterior pelvis is secured with a symphyseal plate
> and a retrograde medullary screw.  The posterior
> pelvis is secured by a sacroiliac screw on the right
> side.

36

> I explained to Terry that she does have a mal united
> pelvic fracture.  This should not contribute to long
> term pain and dysfunction.  I did advise her to
> continue physical therapy for bilateral lower extremity
> strengthening and conditioning . . . .

Tr. 448.

Daniels had an appointment with Dr. Brogle on March 7, 2006.  Tr. 447.  In a report of that appointment Dr. Brogle states that Daniels's "symptoms are consistent with a healing pelvic injury.  She is 6 months down the road and her bony injury appears to be healed.  She needs to rehabilitate the remainder of her musculoskeletal system.  She appears to have a component of sacroiliitis.  I doubt this represents hardware irritation about the sacroiliac screw.  With regard to the paresthesias about the left lower extremity, this may result from sciatic nerve compression near the left ischial tuberosity.[45] Terry at this point in time is free to travel from an orthopedic standpoint.  However, she does require the use of an assistant." Tr. 447.

Dr. Kerrigan examined Daniels again on April 19, 2006.  Tr. 308.  On examination Dr. Kerrigan made clinical findings of a positive Tinel's over the radial nerve at the humeral groove on the left side and negative on the right with tenderness along the

_____

45.  The hip bone is made up of three parts – the ilium, ischium and the pubis.  The ischium forms the lower and back part of the hip bone and is divided into three portions: the body of the ischium, the superior ramus and the inferior ramus.  The superior ramus forms a large swelling, the ischial turberosity or sitz bone.  When sitting the weight is frequently placed upon the ischial turberosity.

left L5-S1 regions as well as marked tenderness over the
sacroiliac joint on the left side.  Tr. 308.

Daniels underwent an MRI of the lumbar spine on April
25, 2006. Tr. 449.  The radiologist reading the MRI observed
degenerative changes at the L4-5 level with a left foraminal
annular tear and foraminal stenosis.  Tr. 449.

On June 13, 2005, Daniels had an appointment with Dr.
Brogle.  Tr. 446.  At that appointment Daniels reported
progressive low back pain and left sided paraspinal pain.  She
also reported pain radiating down her leg to the foot and right
pelvic pain.  Dr. Brogle's physical examination revealed that
Daniels's sacrum was tender along the right side to palpation
posteriorly and slightly diminished sensation over the lateral
aspect of the leg.  He explained to Daniels that "it appears
likely she has a left L5 radiculopathy" and "encouraged her to
proceed with pain management evaluation for an epidural steroid
injection[.]" Tr. 446.

On June 21, 2006, Daniels had an appointment with Steven
B. Mazza, M.D., a board-certified specialist in Physical Medicine
and Rehabilitation.  Tr. 358-365.  Dr. Mazza observed that Daniels
had pain with sitting, limited range of motion in all planes and
decreased sensation over the L5 distribution on the left compared
with the right.  Tr. 359.  Daniels was examined again by Dr. Mazza
on August 14, 2006, at which time he made clinical findings of
reduced range of motion with flexion and extension of the lumbar

38

spine.  Tr. 355. He further found mild tenderness to palpation over the lumbar paravertebral musculature bilaterally with mild spasm. Tr. 355.

Daniels saw Dr. Brogle once again on August 15, 2006. Tr. 445.  On physical examination Dr. Brogle made clinical findings of tenderness along the lumbosacral junction bilaterally, a 1 grade muscle weakness of the EHL[46] on the left side, hypesthesias[47] along the lateral aspect of the left lower extremity. Tr. 445. He stated that Daniels still exhibited evidence of left-sided L5 radiculopathy. Tr. 445.  Dr. Brogle further stated that if after further injections, "she has incomplete pain resolution and continues to have pain and dysfunction secondary to a left-sided L5 radiculopathy, we may consider her a candidate for evaluation by one of the practice's spine surgeons."  Tr. 445.

Daniels continued to experience pain and saw Dr. Mazza on September 6, 2006 and October 11, 2006.  Tr. 349 and 352.  At both appointments Dr. Mazza found that lumbar range of motion was limited in flexion and extension, left and right lateral bending

---

46.  "EHL" is an abbreviation for extensor hallucis longus which is a thin muscle that, inter alia, functions to extend the big toe and dorsiflex the foot (decrease the angle between the foot and leg).

47.  Hypesthesia or hypoesthesia is abnormally decreased sensitivity to stimulation.  See Dorland's Illustrated Medical Dictionary, 804 (27th Ed. 1988)

and left and right rotation because of pain and stiffness.  Tr.
352.

　　　　At a physical therapy session on August 24, 2006, the
physical therapist, Chad Kreider, noted that "Patient seems very
tight in the lower extremities around the hips as well as very
weak with hip and core musculature due to her injury and
subsequent surgery."  Tr. 335.  At a physical therapy session on
September 20, 2006, the physical therapist, Emily Wegmann,
observed that Daniels had pain while sitting on a ball.  Tr. 331.

　　　　Daniels continued to experience pain and saw Dr. Mazza
on December 14, 2006.  Tr. 344-347.  In a report of the
appointment Dr. Mazza states in pertinent part as follows:

> [Daniels] has now undergone multiple epidural injections
> via transforaminal approach without significant benefit.
> She has been essentially out of work since the time
> of her injury.  Her previous job required prolonged
> sitting as well as extensive traveling with prolonged
> plain (sic) flights, as well as lifting of luggage and
> materials.  The patient has not been able to participate
> in these sorts of activities since her injury due to
> pain and dysfunction.  She presents today having had no
> significant benefit from her last epidural injection.
> She reached a small bucket of water at home a week or
> to ago and felt a severe increase in lower back pain
> with significant increase in lower extremity pain into
> the left lower extremity and the dorsum of the foot
> consist[ent] with L5 radiculopathy. . . .

Tr. 345.  Dr. Mazza's physical examination of Daniels revealed a
significant left-sided antalgic gait, limited lumbar range of
motion with pain and stiffness, diminished sensation in the L4-5
distribution on the left compared with the right and an

"exquisitely positive" straight leg raising test[48] on the left.
Tr. 345.   Dr. Mazza under the plan section of his report of the
appointment states:

> At this point, the patient has essentially exhausted and
> failed the conservative measures that we have available
> to treat her left lower extremity radiculopathy with
> L4-5 annular tear and disc injury.  She had been unable
> to maintain significant employment due to severe
> positional discomfort and feels she should continue to
> maintain extremely limited duty.  She should work an
> extremely limited number of hours a week and should
> maintain position change as often as necessary.  She
> should avoid any significant lifting or bending as
> well as prolonged sitting, as would be required for
> the travel required by her job. She has been working
> occasional light duty at a hospice center, which
> she tolerates, but again this is minimal and she only
> tolerates usually one day per week due to severe pain
> and exacerbation with her activities.

Tr. 346.

On February 27, 2007, Daniels underwent a proactive
discography, discometry and itradiscal manometry which are
diagnostic procedures used to identify possible pain generators.
Tr. 34-343.   The procedures were performed by Thomas M. Boetel,
D.O., The Surgical Specialty Center, Bethlehem, Pennsylvania.  Tr.
340. The procedures revealed that Daniels suffered from lumbar
degenerative disc disease and discogenic pain at L3-L4. Tr. 342.

On March 5, 2007, Daniels had an appointment with Dr.
Mazza and was prescribed a Fentanyl patch and Vicodin for pain.

---

48.  The straight leg raising test is a test done to determine
whether a patient with low back pain has an underlying herniated
disc. http://www.mayoclinic.com/health/herniated-disk/
DS00893/DSECTION=tests%2Dand%2Ddiagnosis (visited April 14,
2009).

Tr. 339.  On April 2, 2007, Daniels again had an appointment with Dr. Mazza.  Tr. 439-442.  At that appointment Daniels complained of low back pain and left leg pain.  Dr. Mazza noted that Daniels's lumbar range of motion was limited in flexion and extension, left and right lateral bending, and left and right rotation because of lumbar pain and stiffness. Tr. 439.  He also noted mild tenderness to palpation and spasm over the lumbar and sacral paravertebral musculature bilaterally.  Tr. 439.

A nerve conduction study performed on April 2, 2007, revealed a mild right L5 hypofunction and radiculitis and a marked right S1 hypofunction and radiculitis. Tr. 441.

The administrative record reveals one further appointment with Dr. Mazza on April 10, 2007, at which time Daniels underwent a transforaminal right S1 nerve root corticosteroid injection.  Tr. 443.  Dr. Mazza noted that the procedure was warranted because Daniels's "pain has resulted in clear functional impairments associated with deterioration in certain activities of daily living and quality of life." Tr. 443. We are unable to determine if this procedure resulted in benefit to Daniels because there are no records of follow-up appointments in the administrative record.  However, Daniels was still complaining of pain at the time of the administrative hearing on May 9, 2007.

The administrative record concludes with medical records of appointments Daniels had with Heather van Raalte, M.D., on June

42

18, 2007, and August 23, 2007.  Tr. 452-460.  On August 23, 2007,
Daniels underwent a cystoscopy with hydrodistention of the
bladder.  Tr. 452-453.  The procedure revealed "numerous areas of
bleeding glomerular lesions . . . consistent with interstitial
cystitis."  Tr. 453.

We will now review the additional errors of the
administrative law judge which require that this case be remanded
for further proceedings.  The administrative law judge in her
decision made certain findings about the credibility of Daniels's
complaints of pain. Specifically, the administrative law judge
stated as follows:

> At the hearing the claimant testified that she continues
> with significant back pain which precludes most activity
> particularly that which requires bending at the waist or
> prolonged standing.  The claimant also testified that
> she is limited by bladder spasms and frequent headaches
> as well as fatigue.  The claimant rests frequently
> and experiences flashing lights.  The undersigned
> Administrative Law Judge finds the subjective complaints
> of the claimant to be overstated.  There is evidence of
> an impairment which could be expected to cause the pain
> and limitations alleged by the claimant but not to the
> extent alleged by the claimant.  Simply stated, the
> claimant's complaints are inconsistent with the clinical
> and diagnostic findings found of record particularly as
> they relate to the claimant's exertional and
> non-exertional abilities.
>
> The claimant's task in establishing disability is
> directly dependent on the element of pain which is of
> an intractable nature.  Pain is subjective and difficult
> to evaluate, both quantitatively or qualitatively.
> **Nevertheless, most organic diseases produce
> manifestations other than pain and it is possible to
> evaluate the underlying processes and degree of
> impairment by considering all of the symptoms.
> Generally, when an individual has suffered pain over
> an extended period of time, there will be observable
> signs such as significant weight loss, an altered gait**

**or limitation of motion, local morbid changes, or poor
coloring or station.** In the present case, the claimant
has complained of pain over an extended period of time.
**None of the above signs of chronic pain is evident.
While not conclusive, this factor contributes to the
determination that the claimant is not disabled as a
result of pain.**

Tr. 20-21 (emphasis added).[49] The administrative law judge's

finding that the medical records contain no evidence of an altered

gait, limitation of motion, local morbid changes and poor coloring

is clearly erroneous.  There are several medical records, as

outlined in this order, where the examining physician noted

limitation in range of motion and at least one medical record

where the physician noted an antalgic gait.   Furthermore, there

is evidence that several physicians observed morbid local changes

such as loss of sensation and one observed "a slight duskiness to

the left leg relative to the right" and "the left side being

cooler than the right."  Tr. 141.  Finally, there is no evidence

one way or another regarding whether Daniels suffered a weight

loss or gain over an extended period of time.  We only discern one

medical record where Daniels's weight was recorded.  Tr. 105-106.

       Based on the medical evidence set forth in the

administrative record, including the statements of Daniels to her

_____

49.  In the last year, we have observed the use of this
boilerplate language in numerous decisions issued by
administrative law judges. In fact in one prior appeal, the
decision of the administrative law judge was vacated, inter alia,
because of a similar defect. Merrifield v. Astrue, Civil No.
3:08-CV-343, opinion dated Nov. 24, 2008 (M.D.Pa.).  Standard or
boilerplate language is not per se inappropriate but becomes
inappropriate when the facts of the case do not fit the language.

treating physicians, we conclude the administrative law judge erred when evaluating Daniels's testimony regarding her pain and exertional limitations.

The preference for the treating physician's opinion has been recognized by the Court of Appeals for the Third Circuit and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000).  When the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the administrative law judge may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Id.  In choosing to reject the evaluation of a treating physician, an administrative law judge may not make speculative inferences from medical reports and may reject treating physician's opinions outright only on the basis of contradictory medical evidence. Id.  An administrative law judge may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation or lay opinion.  Id.   An administrative law judge may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility." Id.   The administrative law judge must address the opinions of treating physicians regarding the exertional limitations of a claimant and give an appropriate explanation for accepting or rejecting them. Id.

In her decision the administrative law judge gave no indication as to whether she accepted or rejected Dr. Mazza's opinion set forth in his treatment notes of December 14, 2006, which we quoted at length earlier in this order.  Tr. 345-346.

Dr. Mazza stated that Daniels "should work an extremely limited number of hours a week" and "she only tolerates usually one day per week due to severe pain and exacerbation with her activities."  Tr. 346.  Social Security Ruling 96-08p contemplates disability for an individual incapable of full-time work at step five of the sequential evaluation process. That ruling states that

> ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the  RFC assessment must include a discussion of the individual's abilities on that basis.  <u>A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.</u>

SSR 96-8p, 61 Fed.Reg 34475 (July 2, 1996)(emphasis added). Acceptance of Dr. Mazza's opinion would have required a finding of disability.  We are not satisfied that the administrative law judge appropriately evaluated the opinion of Dr. Mazza.  In fact it appears she ignored or overlooked it because she states that "[n]one of the claimant's doctors have given disabling limitations."  Tr. 20.

The decision of the Commissioner is not supported by substantial evidence.  Consequently, the decision of the Commissioner denying Daniels social security disability benefits

will be vacated and the case remanded to the Commissioner for a
new hearing.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.   The Clerk of Court shall enter judgment in favor of
Terry L. Daniels and against the Commissioner of Social Security
as set forth in the following paragraph.

2.   The decision of the Commissioner of Social Security
denying Terry L. Daniels social security disability insurance
benefits is vacated and the case remanded to the Commissioner of
Social Security:

2.1 To fully develop the record, conduct a new
administrative hearing and appropriately evaluate the medical and
non-medical evidence and issue a new decision in accordance with
the background of this order.

3.   The Clerk of Court shall close this case.


s/Malcolm Muir                              
MUIR
United States District Judge


MM:gs